NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2022 VT 17

No. 21-AP-185

| | |
|---|---|
| Christie Mitchell | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Civil Division |
| | |
| NBT Bank, N.A. | February Term, 2022 |

Samuel Hoar, Jr., J.

Pietro J. Lynn and Adrienne Shea of Lynn, Lynn, Blackman & Manitsky, P.C., Burlington, for
  Plaintiff-Appellant.

Gary L. Franklin of Primmer Piper Eggleston & Cramer PC, Burlington, for Defendant-Appellee.

PRESENT: Reiber, C.J., Eaton, Carroll and Cohen, JJ., and Grearson, Supr. J. (Ret.),
           Specially Assigned

¶ 1.     **CARROLL, J.**  Employee Christie Mitchell appeals a summary judgment order in favor of NBT Bank, N.A. regarding its policy of deducting her overtime compensation from her commissions so that she was never paid more than gross commissions regardless of how many hours she worked in a week. She maintains that the federal Fair Labor Standards Act (FLSA) requires the bank to pay her entire gross commissions plus overtime wages. Because the FLSA contains no such requirement, we affirm.

## I.  Background

¶ 2.     The parties do not dispute the following material facts. Employee, a mortgage-loan originator, worked for the bank from 2017 to 2020, each year signing a new, though not

substantially different, compensation agreement. Employee was nonexempt under the FLSA and was paid on a commission-only basis. Commissions were calculated and paid out every four weeks.

¶ 3. To bridge the gap between commission payouts, the employment contract provided that employee would receive a bi-weekly draw against her future commissions. In 2017, the bank paid this draw at $10 per hour, with an overtime rate of $15 per hour ($10 in straight-time pay and $5 in overtime premium pay). At the end of each four-week period, the bank calculated employee's "regular rate" for the weeks she reported overtime hours. It calculated this rate by dividing her pro rata gross commission by the total hours worked during the week. The bank multiplied the difference between the regular rate and the draw rate by one-half to determine the additional overtime premium. The bank then deducted her draw wages and her additional overtime premium from gross commission and paid her the remaining balance. If her gross commission did not exceed her draw and additional overtime premium, employee kept the draw and the negative balance was carried over to the next period when it was deducted accordingly.[1] As a result, employee received all her gross commissions but never more.

¶ 4. Employee expressed concern about this methodology to her supervisor. She was told the payment method was legal. Employee eventually stopped reporting overtime under the apparent belief that reporting overtime was futile. After leaving the bank, she filed a civil action arguing that the bank's payment method violated the FLSA and Vermont's wage law.[2] Employee

---

[1] The employment contract states that if employee carried a negative balance for three months the draw would be suspended. Employee does not dispute the practice of carrying forward negative balances, and for reasons explained more fully below, this practice does not otherwise violate the FLSA.

[2] The parties agree that because Vermont's wage-and-maximum-hours law, 21 V.S.A. § 384, is substantially like the FLSA, our conclusion today applies equally to § 384.

2

argued that the FLSA requires the bank to pay her overtime wages in addition to gross commissions. The bank disagreed and both parties filed for summary judgment.

¶ 5. The superior court granted summary judgment to the bank. The court explained what was not in dispute. It clarified that this was not a breach-of-contract case, the parties agreed the issue was governed by the FLSA, and they agreed that the bank used the correct regulation to calculate employee's overtime wages. Rather, the sole question was whether the FLSA required the bank to pay employee overtime wages in addition to her gross commissions. Employee argued this was mandated by 29 C.F.R. § 778.119, the specific provision prescribing the method by which an employer must calculate overtime wages in a draw-on-commission plan. The court opined that employee's focus on § 778.119 "distracts her from the real question here: not how much overtime pay is required but instead what is the base pay to which overtime must be added to produce total statutorily mandated minimum compensation." "The flaw in [employee's] analysis," it continued, "is in equating the requirement to use gross compensation in calculating the 'regular rate' with a requirement to pay that gross compensation as some sort of base, to which overtime is then added." It concluded that there was nothing in the FLSA or its regulations that categorically precluded the bank from deducting employee's overtime wages from her gross commissions and carrying any negative running balances forward to the next four-week cycle. The court then performed a series of calculations based on the variables it discerned in § 778.119 to demonstrate that the bank's methodology did not violate the FLSA, which merely requires the payment of a minimum wage and overtime premiums calibrated to a regular rate.

¶ 6. On appeal, employee renews her argument that the FLSA requires the bank to pay overtime wages in addition to her gross commissions. She maintains that the FLSA requires the bank to pay her regular rate and then pay her overtime wages in addition to gross commissions. She suggests the civil division erred in concluding that overtime wages can be deducted from gross commissions so long as gross commissions exceed the FLSA-mandated minimum compensation.

3

The bank counters that nothing in the FLSA expressly prohibits the bank's practice, employee's stipulation that her draw wages were paid "free and clear" largely determines the outcome, and the few authorities that have addressed similar issues support the civil division's conclusion. We agree that the FLSA does not prohibit the bank's method of deducting overtime wages from gross commissions, and that employee's framing of her argument omits an important aspect of the FLSA's structure that helps resolve the dispute.

## II. Analysis

### A. Standard of Review

¶ 7.     We review summary judgment motions using the same standard as the trial court. See Stamp Tech, Inc. ex rel. Blair v. Lydall/Thermal Acoustical, Inc., 2009 VT 91, ¶ 11, 186 Vt. 369, 987 A.2d 292. "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " Martel v. Connor Contracting, Inc., 2018 VT 107, ¶ 5, 208 Vt. 498, 200 A.3d 160 (quoting V.R.C.P. 56(a)). "[W]e give the nonmoving party the benefit of all reasonable doubts and inferences." Id. (quotation omitted).

### B. The FLSA

¶ 8.     The FLSA does not directly address the draw-on-commission plan involved here. Rather, it requires employers to pay a minimum wage of at least $7.25 an hour and mandates that overtime wages are to be paid for all hours worked more than forty hours a week at "one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. §§ 206(a)(1)(C), 207(a)(1). In turn, the FLSA defines the "regular rate" as "includ[ing] all remuneration for employment paid to, or on behalf of, the employee." Id. § 207(e).

¶ 9.     Employee is effectively arguing that she did not receive compensation under § 207(a) for her overtime hours because not only was the bank required to use her gross commissions to calculate her regular rate, but the FLSA also required the bank to pay gross

4

commissions in their entirety.  However, the term "gross commission" does not appear in § 207, and the word "commission" appears only in an unrelated part of § 207(i).  See Dean v. United States, 556 U.S. 568, 572 (2009) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face." (quotation omitted)).  On the other hand, § 207 defines regular rate and prohibits employers from employing "any of [its] employees" who work more than forty hours a week without overtime pay calibrated to the regular rate.  Id. § 207(a).  Thus, § 207 does not prohibit employers from deducting overtime wages from gross commissions because it does not mandate the payment of gross commissions at all.  It simply requires that "all remuneration" is included in calculating the regular rate.  Id. § 207(e).  The regular-rate calculation ensures that employee receives her overtime wages at a rate that reflects her true hourly earnings, not that she receives her overtime wages in addition to her gross commissions.

¶ 10.    Indeed, whether gross commission equals the base pay for calculating overtime wages depends on the contract and is not mandated by the FLSA.  See, e.g., Reinig v. RBS Citizens, No. 2:15-CV-01042-AJS, 2017 WL 8941217, at *15 (W.D. Pa. Aug. 2, 2017) (reasoning draw-on-commission plan permissible where net commissions used to calculate regular rate as opposed to gross commissions).  Employee agrees that the bank calculated her regular rate using gross commission.  In fact, employee agrees with the bank's payment calculation except for the overtime wage deduction from gross commission.  As the superior court demonstrated in some detail below, such a draw-on-commission plan only violates § 207 if employee's statutorily required minimum compensation exceeds her gross commission in a given week and the bank does not make up the difference.  That never occurred here.

C.  Part 778

¶ 11.    Employee next argues that § 778.117 and § 778.119 require that commissions are "payments . . . for hours worked" and must be "included in the regular rate," and that "additional overtime compensation" is due once the new regular rate is calculated, and therefore the bank is

5

prohibited by the FLSA from capping her compensation at gross commissions. However, part 778's overtime calculation provisions do not, and cannot, require a different result from the statute.[3] See Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 321 (2014) ("[A]gencies must operate within the bounds of reasonable [statutory] interpretation." (quotation omitted)).

¶ 12. Under 29 C.F.R. § 778.117, commissions, no matter how paid or how they are delayed, must be included "in the employee's regular rate." The regular rate is an hourly rate, and this rate is "determined by dividing [an employee's] total remuneration for employment . . . in any workweek by the total number of hours actually worked by [an employee] in that workweek for which such compensation was paid." 29 C.F.R. § 778.109; see also id. § 778.117 ("Commissions . . . are payments for hours worked and must be included in the regular rate."). For commission-only plans where the commission payment is delayed, as here, the regulations provide a specific method to calculate the overtime premium. It is best to quote this regulation in full:

> If the calculation and payment of the commission cannot be completed until sometime after the regular pay day for the workweek, the employer may disregard the commission in computing the regular hourly rate until the amount of commission can be ascertained. Until that is done he may pay compensation for overtime at a rate not less than one and one-half times the hourly rate paid the employee, exclusive of the commission. When the commission can be computed and paid, additional overtime compensation due by reason of the inclusion of the commission in the employee's regular rate must also be paid. To compute this additional overtime compensation, it is necessary, as a general rule,

---

[3] We note that the provisions contained in part 778 are not regulations promulgated under the notice-and-comment procedures set forth in the Administrative Procedure Act, 5 U.S.C. § 553. See 29 C.F.R. § 778.1. Instead, part 778 constitutes the Department of Labor's "general interpretations with respect to the meaning and application of the maximum hours and overtime pay requirements contained in section 7 of the [FLSA]." Id. Interpretive rules, like agency opinion letters and operational handbooks, do not have the force of law, "although courts may rely on [them] as persuasive evidence both of Congress's legislative and the Secretary's regulatory intent." Howard v. City of Springfield, Ill., 274 F.3d 1141, 1146 (7th Cir. 2001); see also Russell v. Wells Fargo & Co., 672 F. Supp. 2d 1008, 1011 n.1 (N.D. Cal. 2009) (affording "respect" to part 778 under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1994)). Regardless of their nonbinding nature, the rules are consistent with the statutory provisions and do not prohibit the compensation scheme at issue here.

that the commission be apportioned back over the workweeks of the period during which it was earned. The employee must then receive additional overtime compensation for each week during the period in which he worked in excess of the applicable maximum hours standard. The additional compensation for that workweek must be not less than one-half of the increase in the hourly rate of pay attributable to the commission for that week multiplied by the number of hours worked in excess of the applicable maximum hours standard in that workweek.

Id. § 778.119.

¶ 13.    Employee argues that § 778.119's repeated reference to "additional" means that her overtime wages are payable on top of the gross commissions. But § 778.119 prescribes how an employer must recalculate additional overtime premiums after it allocates delayed commissions— which themselves are "additional" remuneration amounts required to be included in the "regular rate"—over a given pay period, not where the wages come from.[4]  When § 778.119 is read with the rest of part 778, its use of "additional" in the context of delayed commissions becomes clearer. For example, § 778.107 provides that "[i]f the employee's regular rate of pay is higher than the statutory minimum [§ 206], his overtime compensation must be computed at a rate not less than one and one-half times such higher rate." Section 778.119 simply operationalizes this mandate by requiring payments of delayed commissions to accurately reflect any corresponding increase in the employee's hourly rate. If there was no draw, there would be no need for the word "additional" because the overtime premium would simply be calibrated directly to gross commissions. Ultimately, neither the FLSA nor its regulations prohibit overtime wages from being deducted from gross commissions; they merely ensure that employees receive overtime wages.

¶ 14.    Consider the following scenario. Assume that employee works forty-one hours in a workweek. Employee is paid at the draw rate of $10 an hour and $15 an hour for overtime. Employee's draw for this week, therefore, equals $415. Employee's gross commission for the

_____

4  Indeed, § 778.119 does not require an employer to pay an advance when commissions are delayed.

7

week is $500. The bank owes employee additional overtime wages for the forty-first hour because her commission exceeds the draw and she received only $15 for that hour in the draw. To calculate how much more overtime employee must receive, § 778.119 requires the bank to divide the $500 commission (the total remuneration for the week) by forty-one hours to determine employee's regular rate. Rounding up, her regular rate equals $12.20. Her regular rate represents an increase of $2.20 over the draw rate. Next, § 778.119 says that the additional overtime premium can be no less than one-half of the increase in hourly rate. In this scenario, the additional overtime premium is therefore $1.10. Employee, having worked one overtime hour, is entitled to an additional $1.10 premium on top of the $5 premium she already received in the draw. The payment of $18.30 in total overtime wages satisfies § 207 because it is one and one-half times employee's regular rate of $12.20—$15 in the draw plus $3.30[5] for the increase in her hourly rate—which in turn does not violate § 206's prohibition on a minimum wage below $7.25 an hour. Employee's gross commission exceeds her draw and the required additional overtime, and therefore capping the week's pay at $500, which is precisely what the contract does, does not violate the FLSA.

¶ 15. Now consider the same scenario contemplated by the civil division. Employee works fifty-five hours in a workweek. However, she only makes a gross commission of $600. Her draw wages are $625: $400 for the first forty hours and $225 for fifteen overtime hours. The bank apportions the $600 commission to the workweek and calculates her regular rate at $10.91, which makes her additional overtime premium $0.46. Multiplied by fifteen overtime hours, the required additional overtime compensation is $6.75, for a total of $631.82 in required compensation. This violates the FLSA if the bank capped her compensation at $600 this week, because the gross

---

[5] Note that in this context it is the commission itself that supplies that "one" in "one and one-half times the regular rate." 29 U.S.C. § 207(a).

8

commission did not meet the statutorily required minimum compensation.[6]  But this never happened.  Employee's gross commissions always exceeded her draw and any applicable additional overtime premiums.

¶ 16.    Now consider what § 778.119 does not address.  It does not (1) address deductions of overtime wages from gross commissions, (2) discuss gross commissions as a floor or a ceiling relative to payment of overtime wages, or (3) mandate a particular hourly draw rate higher than the minimum wage.  Section 778.119 does not address these issues because they are issues to be determined in the employment contract.

¶ 17.    Employee disagrees.  She compares her situation to an hourly employee who makes $15 an hour.  If that employee works fifty-five hours in a week, they receive $750 in straight-time pay plus an additional $75 in overtime premium pay.  But an hourly employee is not like a commission-only employee paid by periodic draws on future commissions.  An hourly employee is paid a set hourly rate under an agreement between the employee and the employer.  Thus, the employee's $15-per-hour pay rate is also their regular rate, no matter how many hours per week they work.  Not so with a commission-only employee, particularly one who is advanced commissions, including overtime, in the form of a draw.  The existence of a separate regulatory framework to calculate such overtime premiums is further evidence of this.  See 29 C.F.R. §§ 778.117-778.120.  Moreover, employee's analogy disregards the important point that future gross commissions are wages not "delivered" to employee under 29 C.F.R. § 531.35, unlike wages delivered on a weekly or bi-weekly basis to an hourly employee, a point we address in significant detail below.

_____

[6]  As explained above, employee is not challenging the employment contract provision requiring the bank to make up the difference in this scenario and to subsequently deduct that difference from a future pay period in which gross commissions sufficiently exceed her required pay.  In any case, the bank could not claw back wages it had already paid to employee "free and clear."  See infra, ¶¶ 22-23.

9

¶ 18.    Nevertheless, attempting to demonstrate that her position is the right one, employee challenges the civil division's calculations of a hypothetical fifty-five-hour workweek resulting in a $700 gross commission.  She first suggests that the $400 draw for the first forty hours of work is itself a kind of commission that produces a regular rate of $7.27 an hour, rather than the $10 an hour draw rate.  She then notes that "[p]rior to apportionment of the commission," her overtime premium for the draw is $3.64 an hour based on her $7.27 regular rate, which totals $54.60 for the fifteen hours of overtime worked.  "Ultimately," employee suggests, under this scenario the bank "would be obligated to pay [employee] the $400 draw against future commissions and $54.60 in overtime payments, totaling $454.60."   Once the bank applied the $700 commission to the workweek, employee is owed $300, which is the difference between the $700 commission and the "$400 draw."  Employee then calculates the regular rate based on the $700 commission, which is $12.73.  The difference between $12.73 and $7.27 is $5.46, which, according to employee, is the increase in employee's hourly rate as a result of the commission apportionment.  Taking half of this value, $2.73, and multiplying that by fifteen hours of overtime equals an additional $40.95.  Employee adds up $40.95 and $54.60 and argues that this new number, $95.55, is the same amount of overtime premiums the bank would owe employee if she had received no draw.  While technically true, this betrays two related misunderstandings.  First, her methodology is contradicted by the record, including her employment contract, and results in paying herself significantly more overtime than she is owed.  Second, her methodology potentially violates the FLSA.

¶ 19.    The bank paid employee her draw as an hourly rate.  In 2017, this rate was $10 an hour for the draw and $15 an hour for overtime.[7]  Thus, in a week where employee worked fifty-five hours, employee <u>received</u> $400 for the first forty hours of work and $225 for fifteen hours of

---

[7]  For example, the 2018 contract said that the draw constituted "a bi-weekly draw against future commissions based on a $21,632 annual payout."  The contract does not say "employee is paid a base salary of $21,632."

overtime (comprised of $150 in straight-time pay and $75 in overtime premium pay).[8] Employee's paychecks reflect this methodology. However, in her hypothetical, employee turns the $400 draw amount into a second commission. This is a fundamental mistake because (a) the bank never did this, and (b) treating the "$400 draw" as a commission operates to cancel out the $225 in overtime draw wages <u>already</u> <u>paid</u> to employee. The $400 that the trial court used in its calculations and that the bank paid her for the first forty hours of work is both the hourly rate and the regular rate. She is paid $10 for every hour she works, and an extra $5 overtime premium for every hour beyond the first forty. Thus, employee is saying not merely that the bank owes her the gross commissions plus overtime, she is suggesting that the bank owes her gross commissions plus overtime wages plus the $10 hourly rate she was already paid for the overtime hours in the draw—the $700 commission plus $95.55 in overtime premiums plus $150 in additional straight-time pay for the fifteen hours of overtime, or $945.55.[9] This is incorrect.

¶ 20.    In addition to employee's calculation errors, her method would likely violate the FLSA because under this scenario, employee is not paid time and a half for overtime hours at the appropriate time. Section 778.106 provides that the "general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends." <u>Id.</u>; see <u>Powers v. Centennial Commc'ns. Corp.</u>, 679 F. Supp. 2d 918, 923 (N.D. Ind. 2009) (characterizing §778.106 as "regulation which supplements the implicit requirement in the FLSA for prompt payment"); see also <u>Reinig</u>, 2017 WL 8941217, at *7 (explaining that under

---

[8]    Another way to say this is that the bank advanced her $625 against potential future commissions, though with the crucial caveat that she would never have to pay the advance back to the bank should her commissions never exceed that amount.

[9]    Employee's citation to <u>Bedasie v. Mr. Z Towing, Inc.</u>, for the proposition that nonexempt commission-only employees are due an overtime premium on top of straight-time pay is both inapplicable and circular in this context. No. 13 CV 5453 (CLP), 2017 WL 1135727, at *37 (E.D.N.Y. Mar. 24, 2017). The employees in <u>Bedasie</u> were not paid on a draw-on-commission plan, and employee's methodology here in fact double counts straight-time pay.

similar, though not identical, draw-on-commission plan, employer paid employee overtime premiums calibrated to base hourly rate on weekly basis before apportionment of commissions). Thus, if the bank had paid employee only $454.60 in draw wages, it would have contemporaneously underpaid her $170.40 because it owed her $400 for the first forty hours and $225 for the fifteen hours of overtime.[10] Employee's regular rate, in other words, is $10, not $7.27. Consequently, employee's calculation methodology is contradicted by the record, misunderstands the civil division's calculations, results in overpayment of wages, and potentially violates the FLSA.

## D. Other Authorities

¶ 21. The question presented appears to be a matter of national first impression, but a closer inspection of the relevant authorities reveals the novelty to be mostly a function of how employee has framed her argument. Perhaps the most relevant case is Stein v. HHGREGG, Inc., 873 F.3d 523 (6th Cir. 2017). The retail employees[11] in Stein were subject to a draw-on-commission plan. Employees were paid entirely with commissions on retail sales. In workweeks when commissions were not enough to cover the minimum and overtime wages, the employer paid employees a draw to bring them up to the statutory minimums. The employer then deducted the negative balance from commissions in the following pay periods. In overtime weeks, the draw equaled "the difference between an amount set by the Company (at least one and one-half (1½) times the applicable minimum wage) for each [overtime] hour worked and the amount of commissions [actually] earned." Id. at 526. The Sixth Circuit held that deducting the draws from future commissions was permissible under the FLSA.

---

[10]  Indeed, employee implicitly acknowledges the FLSA's requirement for prompt payments by assuming the bank owed her overtime premium pay in the draw.

[11]  The retail or service exemption for overtime wages did not apply to the employees in this case. Stein, 873 F.3d at 528-30.

¶ 22.    The employees had argued that the draws amounted to illegal "kickbacks" because they were not paid "free and clear" under 29 C.F.R. § 531.35.[12]   However, the Sixth Circuit concluded that the plan "[did] not unlawfully 'kick-back directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage <u>delivered</u> to the employee.' "  <u>Stein</u>, 873 F.3d at 531.  The court focused on the second sentence in § 531.35, which explains that an employer may not claw back "wages already delivered to the employee."  <u>Id</u>. at 531(quotation omitted).  It reasoned, supported by surveying a long history of Department of Labor interpretative materials, that commissions are not delivered to employees until they are actually paid; merely earning the commissions from sales does not convert commissions into delivered wages.  Therefore, the court concluded, deducting draws, including overtime draw wages, from commissions did not violate the FLSA.  While it did not address the overtime premiums resulting from delayed commission payments under § 778.119, the reasoning in <u>Stein</u> can be extended to this case.  The FLSA requires payment of all overtime wages, but it does not prohibit the deduction of those wages from gross commissions so long as the minimum standards of § 206 and § 207 are met.

---

[12]  Section 531.35 provides in full:

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear."  The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee.  This is true whether the "kick-back" is made in cash or in other than cash.  For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act.

13

¶ 23.    The bank raised the issue of whether the draw wages were paid "free and clear" in its summary judgment briefing and renewed it on appeal.  Employee does not dispute that that her draw wages constituted "free and clear" payments.  Instead, she characterized the bank's position as "miss[ing] the point; [employee] has never argued that [the bank] violated the 'free and clear' regulation.  The issue here is that [the bank's] practice of deducting [employee's] overtime compensation from her commissions violates the FLSA, and results in denying her any overtime compensation at all."  This is mostly a distinction without a difference, particularly because she does not challenge the bank's policy of carrying forward any negative balance, and because she admits she would not have had to "write a check" for her draw overtime wages to the bank should her commissions fall short.  She attempts to distinguish Stein by characterizing the compensation plan in Stein as "established and publicized" versus her plan which "is completely silent about deducting overtime payments from" commissions.  However, these characterizations relate to employment contracts, not to the FLSA.  Stein squarely holds that an employer may deduct advanced overtime wages from gross commissions because gross commissions are not yet delivered to an employee.  That employee chose to plead her claims largely without addressing the issue of "free and clear" payments does not the change the fact that the two concepts are closely connected.

¶ 24.    In Reinig, mortgage-loan originators were paid a guaranteed base hourly wage drawn against gross commissions.  2017 WL 8941217, at *5.  The employer defined the draw as a "salary or hourly earnings, up to 45 hours per week at one times the [employee's] hourly rate, which are guaranteed and earned but used an as [o]ffset against [g]ross [c]ommissions."  Id.  The employer combined the draw with other "offsets," which were also enumerated in the employment contract, and deducted this amount from gross commissions, paying the net commissions as "earned commissions."  Id.  Employees argued that the practice of calculating the regular rate using net commissions and not gross commissions violated the FLSA, effectively short-changing

14

them overtime pay. The district court disagreed and held that because gross commissions were not "earned commissions" under the employment contract, the employer's practice did not violate the FLSA.[13]

¶ 25. Employee argues <u>Reinig</u> is inapplicable since a holding that an employer can use net commissions and not gross commissions to calculate a regular rate does not address the fact that the bank used gross commissions when calculating her regular rate as mandated in the contract. She maintains that the bank violated the FLSA because her contract mandated payment of gross commissions and was "silent about deducting overtime payments." But employee's position again relies on the existence of a purported contractual obligation for which there is no developed record as to whether the bank breached the contract. <u>Vt. Nat'l Tel. Co. v. Dep't of Taxes</u>, 2020 VT 83, ¶ 64, __ Vt. __, 250 A.3d 567 ("We have repeatedly stressed that we will not address arguments not properly preserved for appeal." (quotation omitted)). In sum, employee has identified no provision in the FLSA or any other authority on the FLSA requiring the bank to pay her overtime wages in addition to her gross commissions. Therefore, we affirm.

<u>Affirmed</u>.

FOR THE COURT:

_____
Associate Justice

---

[13] Interestingly, though the employer deducted the first five hours of straight-time overtime pay from gross commissions per a contract provision, it does not appear that any overtime premiums were deducted from gross commissions. <u>Id</u>. at *7. However, the payment plan in <u>Reinig</u> was detailed and extensive, unlike the one between employee and the bank, and the question of whether capping compensation at gross commissions violated the FLSA was not before the court. See generally <u>id</u>. at *4-7.